UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MARY ADAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:10-cv-00258-JAW |
| | ) | |
| MAINE MUNICIPAL | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

This case presents the intriguing question of whether municipalities in the state of Maine may band together and spend taxpayer dollars to help defeat taxpayer initiatives aimed at controlling government spending.

Over the last decade, Mary Adams, John H. Wibby, Jr., and Pembroke Schaeffer (the Individual Plaintiffs) promoted a number of citizen initiatives in the state of Maine designed to control or limit state and municipal taxation. Those initiatives have been rejected by voters, due in part, they allege, to the Maine Municipal Association (MMA)'s vigorous opposition. MMA is an association whose voting membership is limited to Maine municipalities. According to its Certificate of Organization, MMA serves as "a non-political and nonpartisan organization dedicated to the purpose of promoting good municipal government by exchange of ideas and information through the united effort and cooperation of its members."

Faced with the irony that MMA has used (the Plaintiffs allege) taxpayer money to defeat their efforts to limit municipal taxes, the Plaintiffs are not merely

annoyed. They claim MMA's actions are illegal: first, because as a government entity, MMA is prohibited from taking sides in political matters; second, because MMA has infringed their free speech rights under the United States and Maine Constitutions; and third, because MMA has illegally expended public money for partisan political purposes.[1]

In response to the Plaintiffs' Free Speech claims, MMA raises the government speech doctrine. The Court concludes that the government speech doctrine applies and that the Plaintiffs' claims under the Free Speech Clause of the United States Constitution lack legal merit. The Court's conclusion that the government speech doctrine applies does not bar the Plaintiffs from continuing to pursue their other theories of relief, and they remain free to take their case to the court of public opinion.

## I. STATEMENT OF FACTS

### A. Procedural Background

On June 2, 2010, Mary Adams, John H. Wibby, Jr., Pembroke Schaeffer, and Cyr Plantation (Plaintiffs) filed a complaint against the Maine Municipal Association (MMA) in state of Maine Superior Court for Kennebec County. *Notice of Removal* Attach. 2, Superior Court Summary Sheet, 3-12 (ECF No. 1-2) (*Compl.*). On June 23, 2010, MMA filed a Notice of Removal, removing the case to this Court pursuant to 28 U.S.C. § 1331 because the Plaintiffs asserted a right to relief under 42 U.S.C. § 1983 and under the First and Fourteenth Amendments to the United

---

[1]   Additionally, Cyr Plantation, a MMA Municipal Member, alleges that MMA's activities constitute partisan political activity and are thus *ultra vires*.

2

States Constitution. *Notice of Removal* (ECF No. 1); *Compl.* ¶¶ 13-17. On July 14, 2010, MMA answered the Complaint. *Ans.* (ECF No. 8). On September 22, 2010, the Plaintiffs moved to file an amended complaint and on September 24, 2010, the Court granted the motion. *Pls.' Mot. for Leave to File First Am. Compl.* (ECF No. 12); *Order Granting Mot. for Leave to File Am. Compl.* (ECF No. 13). The Plaintiffs filed the First Amended Complaint on September 24, 2010, and on October 8, 2010, MMA answered the First Amended Complaint. *First Am. Compl.* (ECF No. 15); *Ans. to Am. Compl.* (ECF No. 16).

On February 22, 2011, the Plaintiffs and MMA both moved for summary judgment. *Pls.' Mot. for Summ. J.* (ECF No. 21); *Mot. for Summ. J. of Def. MMA* (ECF No. 22). However, on September 20, 2011, after the motions, responses, and replies had been filed, the Court dismissed the motions without prejudice because it was apparent that the statements of facts were so contentious that the Court would have been unable to reach the merits of the motions. *Order Dismissing Mots. for Summ. J.* (ECF No. 39). The Court held a conference with counsel on September 28, 2011, to discuss the status of the case. *Minute Entry* (ECF No. 41). The parties agreed to attempt to stipulate to a set of facts to allow the Court to rule on whether the government speech doctrine applies to the facts in this case. *Id.*

On November 18, 2011, the parties filed a Joint Stipulation. *Jt. Stip. of Facts* (ECF No. 48) (*Stip.*). On December 9, 2011, the parties filed memoranda and on December 21, 2011, they filed responses. *Pls.' Mem. of Law Concerning Def. MMA's Legal Status and Entitlement to Assert "Gov't Speech"* (ECF No. 51) (*Pls.' Mem.*);

*Def. MMA's Mem. of Law Concerning Its Entity Status and Application of the Gov't-Speech Doctrine* (ECF No. 52) (*Def.'s Mem.*); *Def. MMA's Mem. of Law in Resp. to Pls.' Mem. of Law Concerning MMA's Entity Status and Entitlement to Assert the Gov't-Speech Doctrine* (ECF No. 53) (*Def.'s Resp.*); *Pls.' Resp. to Def. MMA's Mem. of Law Regarding Entity Status and Applicability of Gov't Speech Doctrine* (ECF No. 54) (*Pls.' Resp.*).

On July 3, 2012, MMA moved for summary judgment on whether the government speech doctrine applies and on Counts I through IV of the First Amended Complaint to the extent appropriate based on the Court's conclusion on the government speech doctrine. *Mot. for Summ. J. of Def. MMA* (ECF No. 58) (*Def.'s Mot.*). On July 13, 2012, the Plaintiffs filed an opposition and response to MMA's statement of facts together with a statement of additional facts. *Pls.' Resp. in Opp'n to Def. MMA's Mot. for Summ. J.* (ECF No. 59) (*Pls.' Opp'n*); *Pls.' Supplemental Statements of Material Fact in Resp. to the MMA's Mot. for Summ. J.* (ECF No. 60) (PSSMF). On September 18, 2012, the Court resolved a dispute over the Plaintiff's supplemental statement of facts. *Order* (ECF No. 66). On October 9, 2012, MMA replied. *MMA's Resp. to Pls.' Opp'n to Mot. for Summ. J.* (ECF No. 69) (*Def.'s Reply*); *Def. MMA's Resps. to Pls.' Supplemental Statements of Material Fact* (ECF No. 70) (DRPSSMF).

### B.   Stipulated Facts

The parties stipulated to the following facts:

The MMA is a municipal league based in Augusta, Maine. *Stip.* ¶ 1. MMA executed its organizational documents in 1952 and the Secretary of State for the state of Maine certified the documents in 1953. *Id.* MMA was originally formed in 1936 as an unincorporated association for the purpose of advancing the collective interests of Maine's local governments, among other things. *Id.* MMA was incorporated in 1952 pursuant to what was then Chapter 50 of the Revised Statutes of Maine, entitled Corporations Without Capital Stock. *Id.* MMA now exists under Title 13, Chapter 81 of the Maine Revised Statutes. *Id.* MMA's Certificate of Organization states in part:

> The purposes of said corporation are to serve as an association for the promotion of good municipal government; to be a non-political and nonpartisan organization dedicated to the purpose of promoting good municipal government by exchange of ideas and information through the united effort and cooperation of its members.

*Id.*

MMA operates as a voluntary membership organization offering numerous professional services to municipalities and local government entities. *Stip.* ¶ 2. MMA has varying membership and affiliation levels including: (1) municipal membership, which is open to any Maine city, town, plantation, and any other entity treated as a municipality; (2) associate membership, which is open to counties and quasi-municipal corporations; (3) affiliate status, which is open to county and regional municipal associations and municipal professional organizations; and (4) patron status, which is open to individuals, students,

professionals, and businesses.  *Id.*  Only MMA municipal members are entitled to participate in MMA voting processes.

At all times between 2002 and the present, the Executive Committee of MMA has been established by the MMA Bylaws as the governing body of MMA.  *Id.* ¶ 3. The Executive Committee is composed of twelve elected or appointed municipal officials, including a President, Immediate Past President, Vice President, and nine Executive Committee members (three year stagger[ed] terms) and Executive Committee members are elected by MMA's municipal membership by mail ballot in advance of the MMA Annual Business meeting.  *Id.*  MMA's bylaws state that the "Executive Committee shall be the governing body of the Maine Municipal Association. . . . The Executive Committee shall have control and management of the Association and shall hold and manage all property of the Association."  MMA's bylaws further state that "[t]hroughout their terms of office, each Executive Committee member shall hold the position of municipal officer, as defined in 1 M.R.S.A. §72(12), or the position of town or city manager or chief appointed administrative official, in an active Member municipality."  Regarding the nomination process, MMA's bylaws state:

> No later than the end of February of each year, the President, with recommendations from the Executive Committee, shall appoint a five-member Nominating Committee, composed of two elected municipal officials, two Past Presidents and one member who is either the President of an affiliate organization or is a town or city manager or chief appointed administrative official. The Chair of the Nominating Committee shall be the Immediate Past President.  If the Immediate Past President is unable to serve as the Chair, the MMA President shall appoint another Past President to serve as the Chair.

> . . . No later than Ninety (90) days prior to the annual election, the Nominating Committee shall send Municipal members written notice of the Proposed Slate of Nominees for the Vice President and Executive Committee positions.  In considering nominations to the Executive Committee, the Nominating Committee shall seek a representation from municipalities of various sizes which is reasonably balanced to reflect as nearly as possible the relative distribution of Maine's population among large and smaller municipalities.

The Executive Committee hires and evaluates the Executive Director, who serves as the chief executive officer of MMA.  *Id.*

MMA maintains a Legislative Policy Committee (LPC) composed of two municipal officials elected from each of the 35 Maine state senate districts.  *Stip.* ¶ 4. The LPC is responsible for determining MMA's position on legislation and citizen initiatives as they are being considered during the legislative process and the MMA Executive Committee is responsible for determining MMA's position and activities with respect to citizen initiatives and other municipally related referenda when these measures are placed on statewide ballots.  *Id.*  MMA's advocacy efforts are guided by the municipal officials who are elected to the 70-member Legislative Policy Committee (LPC), an advisory body to MMA.  *Id.*  One purpose of the LPC is to inform MMA's understanding of the position of Maine's municipalities with respect to proposed legislation and ballot measures.  *Id.*  The LPC analyzes proposed legislation and ballot measures affecting municipal governments and recommends whether MMA should support or oppose the legislation (or neither). *Id.*  In this way, the LPC helps develop MMA's legislative priorities and guide MMA's advocacy efforts.  *Id.*  The LPC is composed of two municipal officials from each of Maine's 35 senate districts, elected by the municipal officers of those

districts. *Id.* MMA encourages its membership to regularly communicate the positions and concerns of local communities to their LPC representatives. *Id.* A new LPC is elected every two years. *Id.* Elections are held the same year as legislative elections (even-numbered years), although months earlier than the statewide election in November. *Id.* Shortly after the conclusion of the second session of the Legislature (in April or May of the even-numbered years) an announcement is sent to the Key Municipal Official in all municipalities, informing them of the LPC election and asking for nominations of a candidate from their municipality or any other municipality within their district. *Id.* Once nominations are received, ballots containing the names of all nominees received by the specified deadline are mailed to all municipalities. *Id.* The ballot also contains a space for write-in candidates. *Id.* The boards of selectmen or councils of each municipality within the Senate district make their preference known on the ballot and return it to the Maine Municipal Association by a date certain. *Id.* The nominees or write-in candidates receiving the most votes are elected to the Legislative Policy Committee and so notified. *Id.*

MMA's advocacy/lobbying services are conducted by its State and Federal Relations Department (SFRD) and its focus is the Maine Legislature. *Stip.* ¶ 5. MMA lobbies the Maine Legislature during the legislative session and SFRD staff appear before state agencies and communicate with the Maine congressional delegation on federal issues. *Id.* From 2002 through 2009, members of MMA's Executive Committee received legislative and policy updates and/or met with

politicians. *Id.* MMA's Executive Committee is involved with advocacy efforts relating to public policy. This is accomplished through periodic meetings with the Governor and with members of the congressional delegation, adoption of positions regarding federal issues, and, when it articulates MMA's position on broad policy issues, bond issues and ballot questions that will go before the statewide electorate. *Id.*

MMA municipal members have paid membership dues using a formula based on population and other factors. *Id.* ¶ 6. In addition, MMA charged administrative fees to four[2] insurance trusts affiliated with MMA: Maine Municipal Employees Health Trust ("Health Trust"), Maine Municipal Association Property and Casualty Pool ("PC Pool"), Maine Municipal Association Workers' Compensation Plan ("WC Fund") (collectively the "Trusts"). *Id.* From 2002 to 2009, MMA member dues and administrative fees accounted for 90% or more of MMA's annual revenue with the remainder coming from event income, publications, and the like. *Id.* MMA collects dues from both municipal and associate members. *Id.* Apart from dues and administrative fees, MMA derives revenue from interest income, advertisers in MMA's publications, sales of publications, exhibitors at MMA's annual convention and other conferences, numerous contract services, and training programs that MMA administers, among other sources. *Id.* The Trusts are group insurance and self-funded risk management programs, which provide coverage for property and casualty, public officials liability, unemployment compensation and workers

---

[2]     The Court repeats the Joint Stipulation verbatim, which states that MMA charged administrative fees to four insurance trusts but names only three trusts.

compensation. *Id.* The Trusts are separate entities that pay administrative and management fees to MMA. *Id.* The affiliated Health Trust offers a variety of self-insured employee benefit programs to MMA's members. *Id.* MMA's Executive Committee allocated revenue funds to various "designated funds" at its discretion; one such designated fund is the "Legislative Initiatives Fund" ("LIF"). *Id.*

From 2002 through 2009, nearly 100% of Maine's municipalities were municipal members of MMA. *Stip.* ¶ 7. For the period from 2002 to the present, the towns of Garland, Dover-Foxcroft, Gray, Yarmouth, and Brunswick paid municipal membership dues to MMA. *Id.* From 2002 through 2009, the towns of Garland, Dover-Foxcroft, Gray, Yarmouth, and Brunswick each purchased insurance products from one or more of the Trusts and paid premiums for that coverage. *Id.*

MMA is tax exempt and pursuant to 26 U.S.C. § 115, its income is excluded from "gross income" as that term is used in the Internal Revenue Code. *Id.* ¶ 8. The Trusts' income is tax exempt or tax excluded. *Id.*

Effective in 1995, the Governmental Accounting Standards Board (GASB) issued Statement No. 29, The Use of Not-For-Profit Accounting and Financial Reporting Principles by Governmental Entities. This Statement allows governmental entities that had previously been following accounting principles generally accepted in the United States applicable for not-for-profit organizations the option of continuing that practice with some modifications or following governmental accounting and reporting requirements. The MMA elected to

continue to apply not-for-profit accounting principles in its reporting; therefore, the accounting policies of MMA conform to accounting principles generally accepted in the United States applicable to nonprofit governmental organizations. *Id.* ¶ 9. MMA adopted the provisions of GASB Statements No. 34, 36, 37, and 38 as well as GASB Interpretation 6 as of and for the year ended December 31, 2004. This resulted in changes in MMA's format and content of financial statements. *Id.* MMA follows the applicable provisions of GASB's generally accepted accounting principles (GAAP) for state and local governments through its pronouncements (Statements and Interpretations). *Id.* Additionally, MMA follows the pronouncements of the Financial Accounting Standards Board (FASB) issued through November 30, 1989 (when applicable) that do not conflict with or contradict GASB pronouncements. *Id.* MMA has elected not to follow subsequent private-sector guidance. *Id.*

MMA is subject to some portions of Maine's Freedom of Access Act (FOAA) and has had a formal FOAA policy since 2006. *Stip.* ¶ 10.

Since 2009, MMA and its employees are eligible to participate in the Maine Public Employees Retirement System ("MainePERS"). MMA is a "participating local district" within the meaning of 5 M.R.S.A. § 17001(27). *Id.* ¶ 11.

Maine municipalities voluntarily choose to purchase insurance services from MMA. *Id.* ¶ 12. Some Maine municipalities, including MMA members, bid out insurance services to providers that compete with MMA and some Maine municipalities, including MMA members, purchase insurance services through

providers other than MMA. *Id.* Some Maine municipalities are not members of MMA and therefore do not purchase or receive any insurance services from MMA. *Id.* Within the applicable notice provisions for the respective programs, any Maine municipality could elect to stop purchasing insurance services from MMA at any time. *Id.*

Municipal members are entitled to all MMA services and are eligible to participate in MMA voting and policy processes. *Stip.* ¶ 13. Municipal members are free to withdraw membership at any time for any reason. *Id.* MMA's mission is to provide professional services to local governments throughout Maine and to advocate for their common interests at the state and national levels. *Id.* MMA has a core belief that local government is the keystone of democracy, that municipalities provide citizens with a sense of community and are interwoven in the fabric of Maine's history and heritage, and that local governments are the most accessible and accountable level of government. *Id.* MMA is dedicated to assisting local governments in meeting the needs of their citizens and serving as responsible partners in Maine's intergovernmental system. *Id.* MMA is one of 49 state municipal leagues that, together with the National League of Cities, are recognized at all governmental levels for providing valuable services and advocating for collective municipal interests. *Id.* Like MMA, all 48 other state municipal leagues engage in lobbying and advocate on issues affecting municipal governments. *Id.*

A central aspect of MMA's mission is to advocate for the interests of Maine's local governments through the legislative process. *Id.* ¶ 14. MMA has advocated in

support of or against proposed legislation and has lobbied the Legislature since MMA's inception. *Id.*

In addition to advocacy, MMA provides a number of educational and information services as well as professional services to its members. *Stip.* ¶ 15. These services are funded largely through annual membership dues and fees, and include trainings, publications, manuals, online resources, an annual convention on municipal issues, legal services, and general advisory services, as well as fee-based services in the area of human resource management and labor relations. *Id.*

MMA employs 110 people in numerous departments. *Id.* ¶ 16. MMA's State and Federal Relations Department is chiefly responsible for MMA's lobbying and advocacy activities. *Id.*

Membership in MMA is entirely voluntary and Maine municipalities choose to be members. *Id.* ¶ 17. A municipality that disagrees with the advocacy activities of MMA may withdraw its membership and discontinue its payment of dues, thereby ceasing any undesired contribution to MMA's advocacy activities. *Id.* A Maine municipality that withdraws from MMA membership may rejoin and participate in its programs. *Id.* From the mid- to late-1970s, a number of Maine municipalities withdrew membership in MMA because, in part, they were displeased with MMA's positions on the Maine uniform property tax legislative issue; however, most or all of these municipalities subsequently rejoined MMA. *Id.* Over the years, Maine municipalities have withdrawn and rejoined MMA at various times for various reasons. *Id.* A citizen concerned by MMA's activities may petition

his or her municipality to seek a change in MMA's governance or policies, or to withdraw from MMA membership. *Id.* Plaintiffs pay tax dollars to their municipalities, not to MMA, and it is those municipalities that choose whether to pay funds to MMA. *Id.*

### C.   Additional Facts

#### 1.   Procedural Background

MMA has asked the Court to consider certain additional facts from the court filings that were dismissed without prejudice. *See Def.'s Mot.* at 2. As the Plaintiffs have not objected to this request, the Court has considered the additional facts submitted by MMA. These facts are contained in *Pls.' Statement of Material Facts in Support of Mot. for Summ. J.* (ECF No. 21-1) (PSMF) and *Statement of Undisputed Material Facts of Def. MMA in Support of Its Mot. for Summ. J.* (ECF No. 24) (DSMF). In determining whether these facts are properly included in the summary judgment record, the Court has considered the responses contained in *Pls.' Opposing Statement of Material Facts and Add'l Facts* (ECF No. 29) (PRDSMF), *Def. MMA's Opposing Statement of Material Facts and Statement of Add'l Facts* (ECF No. 33) (DRPSMF), *Def. MMA's Reply Statement of Material Facts in Support of its Mot. for Summ. J.* (ECF No. 37) (DRPRDSMF1), and *Def. MMA's Resps. to Pls.' Reply Statement of Material Facts* (ECF No. 38) (DRPRDSMF2). The Plaintiffs have also submitted supplemental statements of fact, and the Court has considered these too, as well as MMA's responses. *See Pls.' Supplemental Statements of Material Fact in Resp. to the MMA's Mot. for Summ. J.* (ECF No. 60)

(PSSMF); *Def. MMA's Resps. To Pls.' Supplemental Statements of Material Fact* (ECF No. 70) (DRPSSMF).

### 2.    Legal Standard

In accordance with "the conventional summary judgment praxis," the Court recounts the non-stipulated facts in the light most hospitable to the non-movant's case theories, consistent with record support.   *Gillen v. Fallon Ambulance Serv., Inc.,* 283 F.3d 11, 17 (1st Cir. 2002).   In compliance with this obligation, the Court recites supported facts as true even if disputed by MMA.

### 3.    The Facts

#### a.    Additional Background on MMA

The MMA Executive Committee (EC) refused a request by MMA affiliated groups to grant them voting rights on the MMA Legislative Policy Committee (LPC).   PSSMF ¶ 1; DRPSSMF ¶ 1.   Geoff Herman, MMA's Director of State and Federal Relations, noted to the EC that if MMA were to open up voting rights on the LPC, it would be confusing to the legislators if MMA were to represent both sides of an issue.   *Id.*   He noted that several of the groups currently lobby on legislation and take different positions than MMA.   *Id.*

The LPC was created by the EC in the 1970s and is subordinate to the EC in MMA's organizational structure.   PSSMF ¶ 2; DRPSSMF ¶ 2.   MMA's lobbying and advocacy activities are undertaken by tradition.[3]   PSSMF ¶ 4; DRPSSMF ¶ 4.

---

[3]    MMA interposed a qualified response, contending that the phrase "undertaken by tradition" is vague and ambiguous and is not supported by the record citation.   DRPSSMF ¶ 4.   As the record citation states that "MMA has a tradition of serving as an advocate for municipal governments," the Court deems the statement admitted.

### b.     The 2002 Tax Reform Initiative

On May 16, 2002, MMA's Legislative Policy Committee (LPC) unanimously voted to recommend to the Executive Committee (EC) that it proceed with the development of a citizen initiative for tax reform.  PSMF ¶ 39; DRPSMF ¶ 39.  On May 30, 2002, the EC unanimously approved the LPC recommendation and adopted the LPC's plan to develop and enact tax reform through a direct citizens' initiative and approved the formation of a steering committee to provide ongoing advice to the EC and LPC.  PSMF ¶ 40; DRPSMF ¶ 40.  The EC approved a budget unit within MMA's 2002 operating budget to which internal initiative costs were to be charged and the EC approved initial expenditures from the Legislative Initiatives Fund (LIF).[4]  PSMF ¶ 42; DRPSMF ¶ 42.

MMA understood that the vast majority of its members strongly supported the 55% Funding Initiative.[5]  DSMF ¶ 62; PRDSMF ¶ 62.  The EC approved the formation of a political action committee (PAC) for the purpose of submitting the citizens' initiative petition to the Maine Secretary of State, acting in collaboration with the Maine State Chamber of Commerce and/or other organizations.[6]  PSMF ¶ 43; DRPSMF ¶ 43.  MMA registered a PAC called Citizens to Reduce Local Property

---

[4]     MMA interposed a qualified response, objecting to the Plaintiffs' grammar.  DRPSMF ¶ 42. The Court has slightly altered the statement in light of MMA's objection.

[5]     The Plaintiffs denied DSMF ¶ 62 and objected that the statement "is inadmissible because it is based solely on the declaration of Christopher Lockwood."  The Court overrules this objection.  As the Executive Director of MMA, Mr. Lockwood has sufficient personal knowledge of its business affairs to have personal knowledge within the requirement of Federal Rule of Evidence 602.  FED. R. EVID. 602; *United States v. Neal*, 36 F.3d 1190, 1206 (1st Cir. 1994) (insurance compliance specialist at bank allowed to testify about information she actually perceived or observed in her employment).

[6]     MMA interposed a qualified response, objecting to the Plaintiffs' grammar.  DRPSMF ¶ 43. The Court has slightly altered the statement in light of MMA's objection.  MMA has also posited a number of facts, which would be properly placed in its statement of additional facts.

Taxes Statewide.   DSMF ¶ 63; PRDSMF ¶ 63.   On September 25, 2002, the Executive Committee approved further and potentially unlimited expenditures from the LIF to support the PAC.[7]  PSMF ¶ 48; DRPSMF ¶ 48.

On November 21, 2002, Christopher Lockwood briefed the EC on his efforts to encourage the Maine Educational Association (MEA) to join the PAC and to provide organizational and financial support.   PSMF ¶ 50; DRPSMF ¶ 50.   On November 21, 2002, Mr. Lockwood shared information on some anti-MMA activists who were questioning MMA's active involvement in the PAC and using taxpayer money to support the PAC's efforts, and he cautioned that MMA might experience some negative reaction from its own membership.[8]  PSMF ¶ 51; DRPSMF ¶ 51.   On December 10, 2002, Mr. Lockwood discussed with the EC the initiative "worst case" budget, which is identified as $1,082,000.[9]   PSMF ¶ 52; DRPSMF ¶ 52.   On December 19, 2002, Mr. Lockwood announced to the EC that the MEA had officially joined the PAC and had agreed to make a modest financial contribution and that

---

[7]      MMA denied this statement.  DRPSMF ¶ 48.  The Plaintiffs cited page 546 of the appendix, which contains minutes of a September 25, 2002 Executive Committee meeting.  Those minutes reflect that the Executive Committee unanimously passed a motion that authorized the Executive Director to make expenditures in an amount not to exceed $5,000 from the LIF and "to make such additional expenditures from that fund without limitation for that purpose with the concurrence of the MMA President and the Chair of the MMA Tax Reform Initiative Steering Committee."   *Pls.' Mot.* Attach. 11 at 546 (Minutes of Exec. Comm. Board Meeting (Sept. 25, 2002)).  MMA's denial is based on the fact that these additional expenditures required the concurrence of MMA's President and the Chair of its Tax Reform Steering Committee.  DRPSMF ¶ 48.  The Court refuses to accept MMA's denial and deems the statement admitted.

[8]      MMA admits this statement is an accurate quotation from its Executive Committee meeting minutes of November 21, 2002, but it objects on the ground that the statement is hearsay and irrelevant.  DRPSMF ¶ 51.  The Court overrules MMA's objections.

[9]      MMA interposed a qualified response, noting that Mr. Lockwood's estimate was based on a "worst case" scenario.  DRPSMF ¶ 52.  As the Plaintiffs' statement expressly states that Mr. Lockwood discussed a "worst case" budget, the Court refuses to accept MMA's qualified response and deems the statement admitted.

Mark Gray, MEA's Executive Director, had been appointed to the PAC Board of Directors.[10]  PSMF ¶ 53; DRPSMF ¶ 53.

On June 4, 2003, the EC authorized (a) the transfer of $475,049.00 to the LIF from the 2002 General Fund effective December 31, 2002, (b) the transfer of an amount not to exceed $339,617.00 from the General Fund Expendable Fund Balance to the LIF, and (c) the Executive Director to draw on the LIF for contributions to the PAC in an aggregate amount not to exceed $989,166.00, including $110,000.00 contributed to date and $879,166.00 to be transferred as required with the concurrence of the MMA President and Chair of the Steering Committee.[11]  PSMF ¶ 55; DRPSMF ¶ 55.  The EC was regularly briefed on the ongoing and concluded campaign.[12]  PSMF ¶ 56; DRPSMF ¶ 56.  On November 20, 2003, the EC approved a $20,000.00 transfer from the general fund to the LIF for support of the PAC.[13]  PSMF ¶ 57; DRPSMF ¶ 57.  On March 17, 2004, the EC authorized the MMA Executive Director to draw on the LIF in an amount not to

---

[10]    MMA interposed a qualified response.  DRPSMF ¶ 53.  First, it objected to the Plaintiffs' use of "has" in place of "had."  The Court cured the verb tense.  Second, it adds facts that should be added in MMA's statement of additional facts.  On this point, the Court refuses to accept MMA's qualified response and deems the statement admitted.

[11]    MMA interposed a qualified response.  DRPSMF ¶ 55.  To obviate MMA's objection, the Court corrected the date of the Executive Committee meeting, added that the authorization for the transfer of $475,049 was effective December 31, 2002, and noted that the authorizations of funds in (b) and (c) were to be as required.

[12]    The Plaintiffs' original statement read:  "The EC is briefed on the ongoing and concluded campaign."  PSMF ¶ 56.  MMA interposed a qualified response because the statement was vague, ambiguous, and ungrammatical.  DRPSMF ¶ 56.  The Court agrees that that statement, when read in the present tense, makes little sense but it seems clear that the Plaintiffs intended to refer to Executive Committee briefings during and after the campaign and the Court has adjusted the sentence accordingly.

[13]    MMA interposed a qualified response.  DRPSMF ¶ 57.  It noted that the November 20, 2003 motion was unanimously approved.  *Id.*  The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

exceed $100,000.00 for contributions to the PAC for the purposes of promoting the 55% Initiative on the June 2004 ballot and to identify a grassroots consultant.[14] PSMF ¶ 58; DRPSMF ¶ 58.  The MMA urged a "yes" vote on the 55% Initiative.[15] PSMF ¶ 60; DRPSMF ¶ 60.

       **c.**    **The 2004 Act to Impose Limits on Real and Personal Property Taxes (The Palesky Initiative)**

On February 19, 2004, the EC discussed the progress of the Palesky Initiative and Mr. Lockwood informed the Committee that the MMA legal staff was providing a legal opinion on the constitutional provision governing the time for having a citizen initiative appear on the ballot.[16]  PSMF ¶ 62; DRPSMF ¶ 62. Analyses of the Palesky Initiative—including a study conducted by the Margaret Chase Smith Center for Public Policy at the University of Maine—led MMA to conclude that the loss of municipal revenue could have significant adverse impacts on municipal service delivery.[17]  DSMF ¶¶ 77-78; PRDSMF ¶¶ 77-78.  MMA

---

[14]    MMA interposed a qualified response.  DRPSMF ¶ 58.  It noted that the March 17, 2003 motion was unanimously approved with the concurrence of the MMA President and the Chair of the Campaign Strategy Team for these purposes.  *Id.*  The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

[15]    MMA interposed a qualified response.  DRPSMF ¶ 60.  MMA admits that it stated to the readership of the Maine Townsman—which primarily consists of municipal officials of MMA's member municipalities—"Please vote yes on Question 1."  *Id.*  The Court does not view MMA's qualified response as different from the Plaintiffs' statement.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

[16]    MMA interposed a qualified response.  DRPSMF ¶ 62.  MMA corrects the date in the Plaintiffs' statement from May 26, 2004 to February 19, 2004.  *Id.*  Having reviewed the cited record, the Court agrees with MMA and inserted the correct date.

[17]    The Plaintiffs denied this statement because it is based on Mr. Lockwood's declaration and because it fails to mention the specifics of the studies.  PRDSMF ¶¶ 77-78.  The Court overrules the Plaintiffs' objection to Mr. Lockwood's declaration.  *See* note 5.  The reference to the analyses is not for their truth but to explain MMA's decision.  Accordingly, the Court refuses to accept the Plaintiffs' denial and deems the statement admitted.

    MMA's next statement is that 351 of Maine's 492 municipalities required more than 10 mills to support current funding levels of local schools alone.  DSMF ¶ 79.  MMA bases its statement solely

understood that the vast majority of its members strongly opposed the Palesky Initiative.[18]  DSMF ¶ 80; PRDSMF ¶ 80.

Due to the potential for adverse impacts on municipalities, MMA's Legislative Policy Committee and Executive Committee voted that MMA should oppose the Palesky Initiative.[19]  DSMF ¶ 81; PRDSMF ¶ 81.  MMA took a lead role in forming a new PAC, variously called Citizens United for Maine's Future and Citizens United to Protect Our Public Safety, Schools, and Communities (Citizens United I), and in selecting the campaign team.[20]  DSMF ¶¶ 83-84; PRDSMF ¶¶ 83-84.  Every public campaign message disseminated by the Citizens United I PAC was first submitted to MMA for its approval.[21]  DSMF ¶¶ 87-88; PRDSMF ¶¶ 87-88.

On May 26, 2004, the EC authorized the MMA Executive Director to draw on LIF for contributions to the 55% Initiative PAC "or to any anti-tax cap coalition as deemed appropriate by the MMA Executive Director" in an amount not to exceed

---

on an assertion by Mr. Lockwood to this effect.  *Id.*  The Plaintiffs object based on lack of foundation. PRDSMF ¶ 78.  The Court agrees with the Plaintiffs that Mr. Lockwood's statement is more argument than fact and has not included it.

[18]     The Plaintiffs deny this statement because it is based solely on Mr. Lockwood's declaration. PRDSMF ¶ 80.  The Court overrules the objection and deems the statement admitted.  *See* note 5.

[19]     The Plaintiffs denied this statement because it is based solely on Mr. Lockwood's declaration and on its assertion that the Executive Committee voted to oppose the Palesky Initiative by appropriating funds to "any anti-tax cap coalition."  PRDSMF ¶ 81.  The Court previously addressed Mr. Lockwood's declaration.  *See* note 5.  The fact that the Executive Committee voted to fund "any anti-tax cap coalition" does not contradict its opposition to the Palesky Initiative.  The Court refuses to accept the Plaintiffs' denial and deems the statement admitted.

[20]     The Plaintiffs denied these statements on two grounds: the Lockwood declaration objection and an objection based on their assertion that MMA was only one of many organizations taking part in forming the PAC.  PRDSMF ¶¶ 83-84.  The Court previously addressed the Lockwood declaration. *See* note 5.  "A lead role" is consistent with MMA being one of many organizations taking part in forming the PAC.  The Court rejects the Plaintiffs' denial of these statements and deems them admitted.

[21]     The Court compressed statements 88 and 89 into one.  The Plaintiffs denied both.  The Court rejects the Plaintiffs' denials and deems the statements admitted.

$150,000 with the concurrence of the MMA President and Campaign Strategy Team chair.[22]  PSMF ¶ 63; DRPSMF ¶ 63.

On July 15, 2004, Mr. Lockwood briefed the EC in detail "on the coalition to oppose the Palesky Initiative and the campaign strategy for the next several months" with an ad hoc steering committee being in place since June 2004 with the "common goal" being "to defeat the Palesky Initiative."[23]   PSMF ¶ 64; DRPSMF ¶ 64.  The EC authorized the MMA to join the "anti-Palesky" PAC "Citizens United to Protect Our Public Safety, Schools and Communities" (Anti-Palesky PAC) and authorized the MMA Executive Director to join the Citizens United PAC's Board of Directors and/or other positions in the Citizens United PAC.  *Id.*  The EC further authorized the MMA Executive Director with the concurrence of the MMA Officers to expend an additional amount not to exceed $150,000 from the LIF for a total of $210,000.00 in support of the Citizens United PAC.  *Id.*

On November 18, 2004, Mr. Lockwood provided an "Anti-Palesky Campaign Recap" to the EC and the EC discussed—among other matters—"Mary Adams' Tax Payers Bill of Rights referendum."[24]  PSMF ¶ 70; DRPSMF ¶ 70.

### d.  The 2006 Act to Enact a Maine Taxpayer Bill of Rights (TABOR I)

---

[22]    MMA interposed a qualified response, noting that the Executive Committee's vote was unanimous.  DRPSMF ¶ 63.  The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

[23]    MMA interposed a qualified response, noting that these actions were unanimous.  DRPSMF ¶ 64.  The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

[24]    MMA interposed a qualified response, seeking to add additional information.  DRPSMF ¶ 70.  The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

Analyses of the potential effects of the TABOR I proposal—including another analysis by the University of Maine—again led MMA to conclude that the limitations imposed by TABOR I could drastically undercut the ability of municipalities to provide basic municipal services; these studies also led MMA to conclude that TABOR I would restrict municipal revenues and limit municipal governments in their ability to make their own decisions regarding local self-governance, among other things.[25]   DSMF ¶¶ 96-97; PRDSMF ¶¶ 96-97.  As a result of these concerns, the LPC and EC voted that MMA should oppose the TABOR I Initiative.[26]   DSMF ¶ 98; PRDSMF ¶ 98.  MMA understood that the vast majority of its members strongly opposed the TABOR I Initiative.[27]   DSMF ¶ 99; PRDSMF ¶ 99.

MMA took a lead role in reorganizing the Citizens United PAC and in selecting the campaign team.[28]   DSMF ¶ 102; PRDSMF ¶ 102.  MMA approved

---

[25]     The Plaintiffs denied these statements on the ground that there is no supportive record citation beyond Mr. Lockwood's declaration.  PRDSMF ¶¶ 96-97.  The statements are not submitted for the truth of the studies but to explain MMA's motivations.  The Court rejects the Plaintiffs' denial, overrules their objection, and deems the statements admitted.

[26]     The Plaintiffs denied this statement on two grounds: the Lockwood declaration objection and that the MMA Executive Committee minutes do not reflect any formal vote to oppose TABOR I but only to concur in continued involvement in the PAC.  PRDSMF ¶ 98.  The Court previously addressed the Lockwood objection.  *See* note 5.  The Court rejects the Plaintiffs' denial and deems the statement admitted since support of the PAC was equivalent to opposing TABOR I.

[27]     The Plaintiffs denied this statement on two grounds: the Lockwood declaration objection and a lack of foundation for what MMA "understood."  PRDSMF ¶ 99.  The Court previously addressed the Lockwood objection.  *See* note 5.  The Court rejects the Plaintiffs' second ground and deems the statement admitted.

[28]     The Plaintiffs denied this statement on two grounds: the Lockwood declaration objection and that MMA had only one board seat, that the expanded PAC hired the same campaign manager as for the Palesky campaign, and that the campaign manager ran the PAC as before.  PRDSMF ¶ 102.  The Court rejects the Plaintiffs' denial and deems the statement admitted.

every public campaign message disseminated by the Citizens United I PAC before it was disseminated.[29]  DSMF ¶¶ 106-07; PRDSMF ¶¶ 106-07.

On February 15, 2006, Mr. Lockwood noted to the EC that MMA was still awaiting the Secretary of State's certification of the signatures for TABOR I.  PSMF ¶ 74; DRPSMF ¶ 74.  He informed the EC that a meeting of the Citizens United PAC was scheduled for February 22 and that the Board of Directors should have the proposal from Larry Benoit and would look to take action at that time.  *Id.*  Mr. Lockwood further informed the EC that Dana Connors was looking to identify two or three business members to serve on the Board.[30]  *Id.*  On February 22, 2006, Mr. Lockwood sought direction from the EC on how he should vote as a PAC board member on challenging the Secretary of State's certification of the TABOR I initiative signatures.  PSMF ¶ 75; DRPSMF ¶ 75.

On March 16, 2006, the Citizens United PAC held its kick-off rally and Geoff Herman made a presentation on MMA's behalf.  PSMF ¶ 76; DRPSMF ¶ 76.  On April 27, 2006, Mr. Lockwood provided the EC an update on—among other things— the activities of the Citizens United PAC to "defeat TABOR."[31]  PSMF ¶ 77; DRPSMF ¶ 77.  On June 1, 2006, Geoff Herman updated the EC on TABOR activities and "noted that Mary Adams' message is getting a lot of support" and "indicated the importance of developing a strong ground game."  PSMF ¶ 78;

---

[29]    The Plaintiffs denied these statements and raised objections the Court has already overruled.  The Court rejects the Plaintiffs' denials and deems the statements admitted.
[30]    The Plaintiffs neglected to identify either Mr. Benoit or Mr. Connors other than by name.
[31]    MMA interposed a qualified response, seeking to add additional information.  DRPSMF ¶ 77. The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

DRPSMF ¶ 78.   The EC voted to reaffirm MMA's participation in the Citizens United PAC and authorized the Executive Director to contribute up to $85,000 from the LIF to the PAC subject to timing issues.[32]  *Id.*  On June 29, 2006, Geoff Herman informed the EC that the "TABOR campaign is underway" and that "[t]he Association is fully engaged both with membership directly and as a partner with the Citizens United Coalition."  PSMF ¶ 79; DRPSMF ¶ 79.  Mr. Lockwood informed the EC that the MMA officers "gave approval to transmit $25,000 as the first installment of MMA's financial pledge to the Citizens United PAC."  *Id.*   On September 5, 2006, the EC authorized an additional $25,000 contribution to the Citizens United PAC and authorized the Executive Director with the concurrence of MMA's officers to release as much of the committed funding as necessary to cover the costs of the Citizens United PAC's initial television ad.[33]  PSMF ¶ 80; DRPSMF ¶ 80.

On September 21, 2006, Mr. Lockwood informed the EC that MMA was working with MEA and several other organizations to develop a possible alternative proposal to TABOR I.[34]  PSMF ¶ 82; DRPSMF ¶ 82.  On October 5, 2006, Mr. Lockwood and Geoff Herman discussed with the EC a possible alternative proposal

---

[32]   MMA interposed a qualified response, seeking to add that the Executive Committee motion reaffirming MMA's participation in the Citizens United PAC and committing additional funds was unanimous.  DRPSMF ¶ 78.  The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

[33]   MMA interposed a qualified response, seeking to add additional information.  DRPSMF ¶ 80.  The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

[34]   MMA interposed a qualified response, seeking to add additional information.  DRPSMF ¶ 82.  The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

to TABOR I and the EC voted to endorse a "draft proposal developed by a group of organizations including the MMA, MEA, Maine Hospital Association, Maine Service Centers Coalition, and the Maine Better Transportation [Association]" subject to "the acceptance of the proposal by the Maine State Chamber."[35]   PSMF ¶ 83; DRPSMF ¶ 83.

On November 16, 2006, Mr. Lockwood provided the EC with "a wrap-up on the TABOR campaign and noted that the Board of Directors of Citizens United [was] taking the necessary steps to dismantle the [Citizens United] PAC."[36]   PSMF ¶ 84; DRPSMF ¶ 84.   He also noted that "the proponents would undoubtedly try again during the 2008 Election, which leaves the [MMA] with one year to be involved in solid legislative changes that would discredit another challenge."   *Id.*

        **e.**    **The 2009 Act to Provide Tax Relief (TABOR II) and Act to Decrease the Automobile Excise Tax and Promote Energy Efficiency (Excise Tax)**

In the 2009 MMA Strategic and Business Plan, it was noted that

> [t]hree citizen initiatives circulated over the last 14 months have been submitted to the Secretary of State's Office and will in all likelihood be placed on the statewide ballot in November 2009.   Two of those initiatives affect municipal government: the so-called TABOR II proposal and a separate proposal that would cut motor vehicle excise tax revenues by 40%.   (The focus of the third initiative is on the availability of out-of-state health insurance markets.)   It appears the proponents of the three initiatives consider the three proposals to be 'of

---

[35]    MMA interposed a qualified response, seeking to add additional information.   DRPSMF ¶ 83. The appropriate place for additional facts is MMA's statement of additional facts.   The Court refuses to accept MMA's qualified response and deems the statement admitted.

[36]    MMA interposed a qualified response, noting that the reference to "legislative change" is primarily to the Maine State Chamber of Commerce alternative proposal to TABOR I.   DRPSMF ¶ 84.   This clarification may be correct.   However, the Plaintiffs have not responded to this clarification and the Court cannot determine whether accepting the clarification will violate the Court's obligation to view the evidence in the light most favorable to the non-movant and therefore will not include the clarification in the statement of facts for purposes of MMA's motion.

a piece' and somehow interconnected.  In response, therefore, it is probably the case that the opponents of one or more of the several initiatives will organize as a coalition and work in collaboration to defeat the three initiatives.  Because the excise tax initiative poses such a significant threat, MMA will likely engage in that campaign.[37]

PSMF ¶ 86; DRPSMF ¶ 86.  On January 29, 2009 and before certification of the initiative signatures, Mr. Lockwood briefed the EC on "the development of campaign efforts regarding possible citizens initiatives ballot measures" and "provided information on meetings between the MEA to initiate campaign efforts to begin outreach efforts and identify a campaign manager and funding sources."[38] PSMF ¶ 87; DRPSMF ¶ 87.  On February 26, 2009, "in anticipation of various proposed citizen initiatives," the EC authorized the Executive Director to enroll the MMA "as a member of a Political Action Committee (PAC) focused on the TABOR II and Excise Tax citizen initiatives" and authorized expenditure "up to $25,000 from the LIF in conjunction with this effort."[39]  PSMF ¶ 88; DRPSMF ¶ 88.

MMA was concerned that TABOR II would restrict municipal revenues and limit municipal governments in their ability to make their own decisions regarding local self-government.  DSMF ¶ 115; PRDSMF ¶ 115.  The Excise Tax Initiative sought to impose limits on the automobile excise tax, the second largest source of municipal revenue after the real estate property tax.  DSMF ¶ 116; PRDSMF ¶ 116.

---

[37]    MMA interposed a qualified response, seeking to add additional information.  DRPSMF ¶ 86. The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

[38]    MMA interposed a qualified response, seeking to add additional information.  DRPSMF ¶ 87. The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

[39]    MMA interposed a qualified response, seeking to add additional information.  DRPSMF ¶ 88. The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

MMA considered analyses of the Excise Tax Initiative—including an impact estimate for each municipality that it developed—and concluded that the loss of revenue to Maine's municipalities from the proposal could be significant.[40]  DSMF ¶ 117; PRDSMF ¶ 117.   MMA understood that the vast majority of its members strongly opposed both TABOR II and the Excise Tax Initiative.[41]   DSMF ¶ 118; PRDSMF ¶ 118.

The LPC and EC both voted that MMA should oppose TABOR II and the Excise Tax Initiatives.[42]  DSMF ¶ 119; PRDSMF ¶ 119.  MMA took a lead role in organizing a PAC, Citizens Unified for Maine's Future (Citizens Unified) and in selecting the campaign team.[43]  DSMF ¶¶ 120-21; PRDSMF ¶¶ 120-21.  MMA approved every public campaign message before it was disseminated by Citizens Unified.[44]  DSMF ¶¶ 124-25; PRDSMF ¶¶ 124-25.

On April 16, 2009, Mr. Lockwood updated the EC on the "organizational efforts related to the Excise Tax and TABOR II citizen initiates" and "noted that the

---

[40]    The Plaintiffs denied this statement and objected that it is inadmissible because it is based solely on the declaration of Christopher Lockwood.  The Court overrules this objection.  *See* note 5.  The Court rejects the Plaintiffs' denial and deems the statement admitted.

[41]    The Plaintiffs denied this statement and objected that it is inadmissible because it is based solely on the declaration of Christopher Lockwood.  The Court overrules this objection.  *See* note 5.  The Court rejects the Plaintiffs' denial and deems the statement admitted.

[42]    The Plaintiffs denied this statement and objected that it is inadmissible because it is based solely on the declaration of Christopher Lockwood.  The Court overrules this objection.  *See* note 5.  The Court rejects the Plaintiffs' denial and deems the statement admitted.

[43]    The Plaintiffs denied these statements on two grounds: the Lockwood declaration objection and that MMA joined an existing coalition and that the PAC, not MMA, selected the campaign team.  PRDSMF ¶¶ 120-21.  The Court previously addressed the Lockwood declaration.  *See* note 5.  The facts that MMA joined an existing coalition and the PAC, not MMA, assembled the campaign team do not contradict either statement.   The Court rejects the Plaintiffs' denials and deems each statement admitted.

[44]    The Plaintiffs denied these statements on two grounds: the Lockwood declaration objection and that MMA held no seats on the PAC board and could not otherwise dictate to the PAC the message it promulgated.  PRDSMF ¶ 124.  The Court previously addressed the Lockwood objection.  *See* note 5.  The Court overrules the Plaintiffs' remaining objection, refuses to accept the denial, and deems the statements admitted.

ad hoc committee [was] made up of management and lobbyist staff of the MMA, MEA, Maine State Employees Union, Engage Maine, and Maine Service Center Coalition."[45]  PSMF ¶ 89; DRPSMF ¶ 89.  The MMA provided $10,000 to an existing political action committee controlled by the MEA "as a clearing house for the campaign until a more structured campaign and [PAC] is in place." *Id.*  On May 28, 2009, the EC authorized the further expenditure of $25,000 with the concurrence of the MMA officers from the LIF in "conjunction with the Excise Tax and TABOR II citizen initiatives."[46]  PSMF ¶ 90; DRPSMF ¶ 90.

On August 17, 2009, the EC authorized an additional payment of $60,000 to Citizens Unified.[47]   PSMF ¶ 94; DRPSMF ¶ 94.  Mr. Lockwood observed in a memorandum to the EC that "[t]he primary reason for requesting an additional authorization" was "to strengthen the PAC's position in advance of an August 20 meeting in Washington, D.C. with the political directors of the major national labor organizations.  At that meeting, Mark Gray (Executive Director of the [MEA] who is also serving as the Chairman of the [Citizens Unified] Steering Committee) and Toby McGrath ([Citizens Unified] campaign manager) will be requesting $700,000 in funding from these organizations.  Mark Gray has indicated that [Citizens

---

[45]     MMA interposed a qualified response, seeking to add additional information.  DRPSMF ¶ 89. The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

[46]     MMA interposed a qualified response, seeking to add additional information.  DRPSMF ¶ 90. The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

[47]     MMA interposed a qualified response seeking to add additional information.  DRPSMF ¶ 94. The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

Unified's] position will be strengthened if it could point to funds raised from organizations/businesses based in Maine."[48]   PSMF ¶ 95; DRPSMF ¶ 95.

On August 27, 2009, Mr. Lockwood advised the EC that the campaign was looking to raise $2.5 million for the campaign and that approximately $700,000 had been raised to date.   PSMF ¶ 96; DRPSMF ¶ 96.   He noted that a majority of the funding was needed to run the media campaign.   *Id.*   It was noted that the funds raised would be used to run both the Excise Tax and TABOR II campaigns without any restraints being made by contributors.   *Id.*

On October 1, 2009, Mr. Lockwood provided the EC with a campaign update and presented to the EC four campaign television ads developed for the campaign (Door Bell, Fine Print, Teacher, and Tow Truck).[49]   PSMF ¶ 97; DRPSMF ¶ 97.   The EC authorized a contribution of $60,000 to the Citizens Unified PAC "to complete MMA's pledged financial support."   *Id.*   The MMA Staff provided to the EC a confidential memorandum discussing current Citizens Unified financing and contributors, polling and prospective donors.   *Id.*   Also on October 1, 2009, the EC voted to support repeal of Maine's school consolidation law.[50]   PSSMF ¶ 3; DRPSSMF ¶ 3.

---

[48]      MMA objects to what it contends are hearsay statements from Mark Gray in this statement. DRPSMF ¶ 95.  The Court overrules the objection.

[49]      MMA interposed a qualified response seeking to add additional information.  DRPSMF ¶ 97. The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

[50]      MMA interposed a qualified response contending that the Plaintiffs' additional assertion that the EC's vote contradicted the position taken by the LPC is unsupported by the record citation. DRPSSMF ¶ 3.  As the record citation does not mention the LPC, the Court has excluded this portion of the Plaintiffs' statement.

On October 22, 2009, the EC authorized the Executive Director to contribute additional amounts up to $20,000 in the aggregate to the Citizens Unified PAC from the LIF.[51]  PSMF ¶ 99; DRPSMF ¶ 99.

### f.   MMA's Advocacy

Municipal governments broadly opposed the Palesky, TABOR I, TABOR II, and Excise Tax Initiatives and broadly supported the 55% Funding Initiative.[52] DSMF ¶ 143.  Mr. Wibby testified that his impression was "that every municipal government everywhere was opposed to TABOR I . . . ."[53]  DSMF ¶ 144.  MMA refrains from advocating on a given issue unless its advocacy will affect municipal interests, no matter how important the issue is to a given party.[54]  DSMF ¶ 162.

## II.   THE PARTIES' POSITIONS

### A.   The Plaintiffs' Position

The Plaintiffs contend that MMA is "not a government unit or department but a non-profit corporation recognized by the Maine Legislature as a 'municipal advisory organization' and an 'instrumentality of its member municipal and quasi-municipal corporations' because of the support services it provides to local government."  *Pls.' Mem.* at 1 (ECF No. 51).  The Plaintiffs concede that MMA is "thoroughly intertwined with government," but they maintain that "it is not itself a

---

[51]      MMA interposed a qualified response seeking to add additional information.  DRPSMF ¶ 99. The appropriate place for additional facts is MMA's statement of additional facts.  The Court refuses to accept MMA's qualified response and deems the statement admitted.

[52]      The Plaintiffs admitted this statement but objected to its relevance.  PRDSMF ¶ 143.  The Court overrules the Plaintiffs' objection.

[53]      The Plaintiffs admitted this statement but objected to its relevance.  PRDSMF ¶ 143.  The Court overrules the Plaintiffs' objection.

[54]      The Plaintiffs admitted this statement but objected to its relevance.  PRDSMF ¶ 162.  The Court overrules the Plaintiffs' objection.

unit of government." *Id.* at 27.  They assert that "there is no case holding that a non-governmental entity is entitled to assert the [government speech] doctrine for itself." *Id.*  Nor, according to the Plaintiffs, can MMA justifiably claim that it fits within the government speech exception because it speaks for its member municipalities. *Id.* at 27-28.  Furthermore, to claim that its speech is government speech, MMA would have to demonstrate that its speech accurately reflected the speech of the government; whereas, here, "MMA is not structurally accountable to its governmental members, except to maintain them as members — as customers, in other words." *Id.* at 28.   Finally, the Plaintiffs say there "is no political accountability" for MMA's actions; the parties have stipulated that "the only recourse the Plaintiffs have against the MMA is to petition their municipalities to seek a change in the MMA's governance or policies or to withdraw from MMA membership." *Id.* at 29.

### B.    MMA's Position

MMA concedes that it is not "government *per se*, inasmuch as it has no legislative, regulatory, judicial, or executive power over Maine's citizens." *Def.'s Mem.* at 2 (ECF No. 52).  However, it argues that it "has a number of indicia of government and in many ways more closely resembles government than a private party." *Id.*  In the context of this case, MMA contends that it "functions as an instrumentality, or agent, of Maine's municipal governments." *Id.*  Thus, it says, "whether the Court determines that MMA is a private entity, a quasi-governmental entity, or a governmental entity, the government-speech doctrine is fully

applicable." *Id.* at 3.  MMA next contends that regardless of the Court's conclusion as to its governmental status, the government speech doctrine applies to MMA's referendum expressions and precludes the Plaintiffs' First Amendment claims because the government effectively controlled the message.  *Id.* at 17-39.  Finally, MMA argues that even if the government speech doctrine does not apply, the Plaintiffs have not demonstrated any infringement of their First Amendment rights.  *Id.* at 39-40.

### C.   MMA's Response

In response, MMA maintains that the Plaintiffs, having alleged in their Complaint that MMA is a governmental or quasi-governmental agency, should not be permitted to "try to distance themselves from the damning allegations of their Amended Complaint." *Def.'s Resp.* at 2 (ECF No. 53).  MMA further claims that if it is a private entity, its individual members lack standing as municipal taxpayers to pursue their claims against MMA.  *Id.* at 3-5. Noting that the Plaintiffs have conceded that its lobbying activities are permissible, MMA argues that because there is "no principled distinction" between lobbying and MMA's participation in citizen initiatives, the Plaintiffs' arguments must fail.  *Id.* at 5-8.  MMA then turns to the Plaintiffs' constitutional analysis and finds it wanting.  *Id.* at 8-14.

### D.   The Plaintiffs' Response

The Plaintiffs respond that the MMA is not the legal agent or alter ego of its municipal members for purposes of the government speech doctrine. *Pls.' Resp.* at 1-8 (ECF No. 54).  The Plaintiffs dispute the notion that the member municipalities

of MMA speak with one governmental voice so that when it speaks, it is accountable to the electorate. *Id.* at 8-13.

### E.   The Plaintiffs' Opposition to the Motion

In opposing MMA's motion for summary judgment, the Plaintiffs argue over the meaning of *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005), and contend that it does not support MMA's contention that its actions are protected by the government speech doctrine. *Pls.' Opp'n* at 2-4 (ECF No. 59). The Plaintiffs add that even if the Court were to find that the government speech doctrine applies to MMA, that would not dispose of Counts I-IV. *Id.* at 4-6. Finally, the Plaintiffs reassert that MMA is not politically accountable. *Id.* at 6-7.

### F.   MMA's Reply

MMA resumes the fight over *Johanns* in its reply. *Def.'s Reply* at 1-6 (ECF No. 69). MMA claims that "the issue of MMA's control over the PACs is a red herring." *Id.* at 7.

## III.   DISCUSSION

### A.   Legal Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). For summary judgment purposes, "genuine" means that "a reasonable jury could resolve the point in favor of the nonmoving party," and a "material fact" is one whose "existence or nonexistence has the potential to change the outcome of the case." *Tropigas de Puerto Rico, Inc. v.*

*Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (citations omitted).

"The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case." *Phair v. New Page Corp.*, 708 F. Supp. 2d 57, 61 (D. Me. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Phair*, 708 F. Supp. 2d at 61 (citing *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004)).

## B. Whether the Plaintiffs are Bound by the Allegations in their Complaint

As an initial matter, MMA argues that the Plaintiffs have alleged in their pleadings that MMA is a governmental entity, and that they should be bound by those allegations. *See Def.'s Resp.* at 1-3; *Compl.* ¶ 7 (ECF No. 7-2) (alleging that MMA "has organically evolved into a governmental entity or 'state actor' for purposes of this action"); *First Am. Compl.* at Introductory Paragraph and ¶¶ 7, 15 (ECF No. 15) (referring to MMA's monetary contributions as "illegal governmental expenditures," alleging that MMA "functions as a governmental or quasi-governmental entity," and asserting that MMA's actions are "government 'taking sides'" and "direct governmental interference with an initiative").

MMA is correct that a "party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 61 (1st Cir.

1992) (citation omitted).  At the same time, however, "a pleading should not be construed as a judicial admission against an alternative or hypothetical pleading in the same case."  *Id.*  Rule 8(d)(3) expressly allows a party to "state as many separate claims or defenses as it has, regardless of consistency."  FED. R. CIV. P. 8(d)(3).  In addition, "[t]o be binding, a judicial admission must be 'clear.'"  *Harrington v. City of Nashua*, 610 F.3d 24, 31 (1st Cir. 2010) (citation omitted).

Here, the Plaintiffs amended their original Complaint to allege that MMA is a "private corporation without stock" that "functions as a governmental or quasi-governmental entity."  *First Am. Compl.* ¶ 7.  This does not amount to a clear judicial admission that MMA is a governmental entity for purposes of the government speech doctrine.  As the discussion below explains, an organization may be considered a governmental entity for some purposes (such as the state actor requirement of § 1983), but not for others (such as the government speech doctrine). Though the Plaintiffs allege elsewhere in their Complaint that MMA's actions constitute "government taking sides," they are free to argue alternative or hypothetical theories of relief.  The Court declines to treat as judicial admissions the allegations in the Plaintiffs' Complaint that state or imply that MMA is a governmental entity.

## C.    The Government Speech Doctrine

The government speech doctrine provides that government speech is "not restricted by the Free Speech Clause."  *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).  "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."  *Id.* at 467 (quoted by

*Sutliffe v. Epping School District*, 584 F.3d 314, 329 (1st Cir. 2009)); *see also Johanns v. Livestock Marketing Association*, 544 U.S. 550, 553 (2005) ("the Government's own speech . . . is exempt from First Amendment scrutiny") (quoted by *Sutliffe*, 584 F.3d at 329). The First Circuit has noted that the purpose of the government speech doctrine is to recognize "the government's authority to choose viewpoints when the government itself is speaking." *Griswold v. Driscoll*, 616 F.3d 53, 58-59 (1st Cir. 2010) (citing *Summum*, 555 U.S. 460).

Although the government speech doctrine is now securely fixed as part of First Amendment jurisprudence, it is still comparatively new and undeveloped. Justice Souter, sitting on a First Circuit panel in 2010, described the doctrine as "still at an adolescent stage of imprecision." *Griswold*, 616 F.3d at 59. Justice Breyer, concurring in a 2009 Supreme Court case, wrote that "the 'government speech' doctrine is a rule of thumb, not a rigid category" and cautioned against "turn[ing] 'free speech' doctrine into a jurisprudence of labels." *Summum*, 555 U.S. at 484. The Plaintiffs contend that "[t]o hold that the MMA may assert government speech would be a radical enlargement of a doctrine that is probably meant to be exercised cautiously." *Pls.' Mem.* at 29.

Two limiting principles have emerged. The first looks to the type of entity asserting the doctrine: roughly speaking, "governmental entities" may invoke it; "non-governmental entities" may not. The second looks to the speech's content and the plaintiff's legal theory—for instance, the government speech doctrine has no application in Establishment Clause or Equal Protection Clause cases.

### 1.    Limitations Based on Entity Status

In *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005), the United States Supreme Court wrote that "[o]ur compelled-subsidy cases have consistently respected the principle that compelled support of a private association is fundamentally different from compelled support of government." *Id.* at 559. However, only a few cases have addressed the distinction between private associations and government for purposes of the government speech doctrine, and these cases reveal that deciding whether the government speech doctrine applies is not as simple as deciding between two labels.

In *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990), members of the State Bar of California successfully invoked the First Amendment to prevent the State Bar from using their dues to fund ideological activities with which they disagreed.  In its defense, the State Bar invoked the government speech doctrine, but, reversing the California Supreme Court, the United States Supreme Court held that the doctrine did not apply.  *Keller*, 496 U.S. at 10-13.  The *Keller* Court contrasted the State Bar with "typical" or "traditional" government agencies and officials but stopped short of holding that the State Bar was "non-governmental."  *Id.*; *but see Johanns*, 544 U.S. at 559 (noting that the speech in *Keller* "was, or was presumed to be, that of an entity other than the government itself").

In distinguishing the State Bar from "other entities that would be regarded in common parlance as 'governmental agencies,'" the Supreme Court noted that (1) its principal funding came from member dues rather than appropriations; (2) only

lawyers admitted to practice in California were members, and all such lawyers must be members; (3) its services were "essentially advisory in nature"; and (4) it did not admit, disbar, or suspend anyone, nor did it ultimately establish ethical codes of conduct. *Keller*, 496 U.S. at 11-12. The State Bar, according to the *Keller* Court, was substantially similar to an employee union. *Id.* at 12. The Supreme Court noted that the State Bar was created "not to participate in the general government of the State, but to provide specialized professional advice to those with the ultimate responsibility of governing the legal profession." *Id.* at 13. "These differences," according to the Court, made the State Bar sufficiently different from "traditional government agencies and officials" to prevent it from asserting the government speech doctrine. *Id.*

Presumably, although the Supreme Court did not discuss it, the State Bar nevertheless did qualify as a state actor for purposes of § 1983 and the Fourteenth Amendment, since the *Keller* Court ruled that the plaintiffs were entitled to relief from a First Amendment violation. Consequently, cases discussing entity status in contexts other than government speech provide scant guidance as to the proper analytic track to determine the nature of an entity for purposes of the government speech doctrine.

For instance, in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), the Supreme Court held that a statewide association incorporated to regulate athletic competition among the state's public and private schools was a state actor for purposes of the Fourteenth Amendment.

*Id.* at 302.   The Supreme Court was concerned primarily with "the state-action requirement of the Fourteenth Amendment," but also noted that the analysis would be no different for the "under color of state law" requirement of § 1983.   *Id.* at 295 n.2.   MMA would clearly be considered a state actor under *Brentwood*, since the government is "entwined in [MMA's] management or control."   *See id.* (quoting *Evans v. Newton*, 382 U.S. 296, 301 (1966)); *see also MMM Healthcare*, 2012 U.S. App. LEXIS 18913, *7 (1st Cir. Sept. 7, 2012) (stating that private actors may be deemed "governmental" where "government actors possess such influence over a nominally private entity that there exists 'public entwinement in the management and control' of the entity") (quoting *Brentwood*, 531 U.S. at 297).   But the *Brentwood* Court did not mention the government speech doctrine, and *Keller* suggests that an organization may be governmental for some purposes, such as § 1983, yet not be entitled to the protection of the government speech doctrine.

MMA relies heavily on *Lebron v. National Railroad Passenger Corporation*, 513 U.S. 374 (1995), to establish its status as a government entity for First Amendment purposes.   *See Def.'s Mem.* at 10-16.   In *Lebron*, however, just as in *Brentwood*, the stakes were reversed: "governmental entity" status subjected the defendant to, rather than immunized the defendant from, liability under the Constitution.   Given *Keller*'s narrow, fact-bound analysis of government entity status for purposes of the government speech doctrine, *Brentwood* and *Lebron* are of little assistance in deciding whether the government speech doctrine applies. *Contra Delano Farms Co. v. California Table Grape Commission*, 586 F.3d 1219,

39

1224-26 (9th Cir. 2009) (concluding that "*Lebron*, like *Johanns*, speaks generally to whether the speech is government speech for purposes of the First Amendment").

Whereas *Keller* suggests that an organization can be governmental for some Constitutional purposes yet not enjoy the protections of the government speech doctrine, *Johanns* suggests that the converse is also true.   The *Johanns* Court expressly refrained from deciding whether the literal speaker was governmental yet held that the government speech doctrine applied.   *See Johanns*, 544 U.S. at 560 n.4.  In *Johanns*, a federal statute imposed a $1-per-head assessment (or "checkoff") on all sales or importation of cattle; the resulting revenues were to be used to fund, among other things, promotional campaigns.  *Johanns*, 544 U.S. at 553-54.  A large fraction of the checkoff revenues was used to fund generic beef advertisements.  *Id.* at 554.  The advertisements were approved by the Secretary of Agriculture but were designed by a committee whose members came from private industry.  *Id.* at 553-54. Many of these advertisements used the slogan "Beef. It's What's for Dinner." and bore the attribution "Funded by America's Beef Producers."  *Id.* at 554-55.  Some of the beef producers subject to the checkoff objected to the promotion of beef as a generic commodity, believing it impeded their own efforts to promote the superiority of, for instance, American beef, grain-fed beef, or certified Angus or Hereford beef. *Id.* at 556.   They sued, arguing among other things, that the checkoff was a compelled subsidy of speech that violated their First Amendment rights.  *Id.* at 555-56.  The Supreme Court held that the advertising in question represented the

government's own speech, and therefore was "exempt from First Amendment scrutiny." *Id.* at 553.

Although the beef ads were designed by a committee whose members came from private industry, the Supreme Court applied the government speech doctrine because it concluded that "[t]he message of the promotional campaigns is effectively controlled by the Federal Government itself." *Id.* at 560. The *Johanns* Court found that "[t]he message set out in the beef promotions [was] from beginning to end the message established by the Federal Government." *Id.* Congress and the Secretary of Agriculture "set out the overarching message" by law and regulation, and left "the development of the remaining details to an entity whose members are answerable to the Secretary." *Id.* at 561. Additionally, the Secretary "exercise[d] final approval authority over every word used in every promotional campaign" and officials from the Department of Agriculture participated in the open meetings at which proposals were developed. *Id.* The Supreme Court observed that "[t]his degree of governmental control over the message funded by the checkoff distinguishes these cases from *Keller*." *Id.* *Johanns* holds that when "the government sets the overall message to be communicated and approves every word that is disseminated," courts may skirt the sometimes-difficult matter of characterizing an organization as governmental or non-governmental. *Id.* at 562.

### 2.   Limitations Based on Content of Speech

Whether the protections of the government speech doctrine are available also depends on the content of the challenged speech and the legal theory argued by the challenger.

### a.    Protections Limited to Free Speech Clause Challenges

The Supreme Court recently made clear that the government speech doctrine provides only that government speech is "not restricted by the Free Speech Clause," *Summum*, 555 U.S. at 469; the doctrine does not immunize government speech from attack under other laws or Constitutional provisions.  *See id.* at 468 ("The involvement of public officials in advocacy may be limited by law, regulation, or practice").  Put another way, the government speech doctrine does not confer on the government a Constitutional right to speak; it provides only that government speech does not infringe the Free Speech rights of individuals.

Therefore, if government speech is religious in nature, it might be challenged under the Establishment Clause.  *See id.* ("government speech must comport with the Establishment Clause").  If government speech is discriminatory, it might be challenged under the Equal Protection Clause.  *Summum*, 555 U.S. at 482 (Stevens, J., concurring) ("government speakers are bound by the Constitution's other proscriptions, including those supplied by the Establishment and Equal Protection Clauses").  Even when a challenge is brought under the Free Speech Clause, the government speech doctrine's protections appear to be limited.  For instance, the Court in *Johanns* suggested that the doctrine does not extend to compelled speech

challenges. *See Johanns*, 544 U.S. at 564-66 (noting that on some set of facts, a compelled speech theory might form the basis for an as-applied challenge).

### b.     Germaneness

In *Keller*, the Supreme Court held that the State Bar of California may "constitutionally fund activities germane to" its goals of "regulating the legal profession and improving the quality of legal services." *Keller*, 496 U.S. at 13-14; *see also Abood v. Detroit Board of Education*, 431 U.S. 209, 235 (holding that a public teachers' union may constitutionally spend funds to advance political or ideological causes "germane to its duties as collective-bargaining representative"); *Johanns*, 544 U.S. at 558-59 (discussing the germaneness requirement of *Keller* and *Abood*).

The germaneness requirement is part of the Court's compelled subsidy jurisprudence, and *Johanns* suggests that it does not apply when the government speaks. *See Johanns*, 544 U.S. at 558 n.3 (noting that the speech at issue was not germane to a broader regulatory system). Nevertheless, even after *Johanns*, courts have analyzed whether speech is germane to a legitimate government interest in deciding whether to apply the government speech doctrine. *See, e.g., Kidwell v. City of Union*, 462 F.3d 620, 626 (6th Cir. 2006) (applying the government speech doctrine while noting that "Union's speech in this case was germane to its role as governor").

Some of the confusion on this point may come from imprecision regarding the function and meaning of the government speech doctrine. Although the doctrine is

often, as in this case, asserted like an affirmative defense or a doctrine of immunity, its application means simply that no Constitutional violation occurred, not (as would be the case with a true immunity doctrine) that a violation may have occurred but is not redressable.  In other words, analyzing whether the government speech doctrine applies amounts to the same thing as analyzing whether the Government has violated an individual's Constitutional rights; couching the discussion in terms of government speech simply approaches the question from a different angle.  Thus, the government speech doctrine will look somewhat different according to the type of First Amendment violation alleged.  Where the alleged violation involves a compelled subsidy, germaneness may therefore be instructive in determining whether to apply the government speech doctrine.  Nevertheless, *Johanns* suggests that when the government speaks, a compelled subsidy challenge will fail even if the speech is not germane to a "broader regulatory scheme." *Johanns*, 544 U.S. at 558.

### c.    Campaign Speech

The Plaintiffs urge this Court to apply a content-based exception to the government speech doctrine for campaign speech.  Whether such an exception is appropriate has already been squarely addressed by the Sixth Circuit, in a case where a city council spent public funds to oppose a series of ballot initiatives concerning local issues such as the provision of fire, water, and sewage services.  *See Kidwell v. City of Union*, 462 F.3d 620, 622-623 (6th Cir. 2006).

44

The Sixth Circuit first observed that the case should be analyzed as a compelled subsidy case. *Kidwell*, 462 F.3d at 624. The plaintiffs in *Kidwell* acknowledged that they were making a Free Speech challenge to government speech in the face of *Johanns*, but argued that "[b]ecause the asserted subsidy arose in the context of an election, . . . [the] court should find [the city's] speech to be unconstitutionally compulsive." *Id.* at 625. The Sixth Circuit rejected this argument, and declined to carve out an election-based exception to the government speech doctrine.

In holding that the government speech doctrine applied, the *Kidwell* majority rightly distinguished many of the cases relied on by the Plaintiffs here as decided on statutory or other non-constitutional grounds. *See id.* at 625 n.3, distinguishing *Dist. of Columbia Common Cause v. Dist. of Columbia*, 858 F.2d 1 (D.C. Cir. 1988), *Stanson v. Mott*, 551 P.2d 1 (Cal. 1972), *Citizens to Protect Public Funds v. Bd. of Educ.*, 98 A.2d 673 (N.J. 1953), and *Mountain States Legal Found. v. Denver Sch. Dist. No. 1*, 459 F. Supp. 357 (D. Colo. 1978). The Sixth Circuit suggested that there must be "some limit on the government's power to advocate during elections," but rejected a "bright line rule barring such speech." *Kidwell*, 462 F.3d at 625. In ruling that the facts before it did not present a case for relief under the Constitution, the *Kidwell* Court looked to two factors in particular. First, the city's speech was on topics squarely within "its competence as governor": emergency services and tax initiatives. *Id.* at 626. This factor echoes the germaneness

requirement of *Abood* and *Keller*.  Second, the majority distinguished the case from "hypothetical cases of government speech in support of particular candidates." *Id.*

The Fourth Circuit has also rejected the argument "that the government speech doctrine should, in any event, never apply when the government attempts to influence legislation." *Page v. Lexington County School District One*, 531 F.3d 275, 287-88 (4th Cir. 2008).  In *Page*, the plaintiff argued that a school district had engaged in unconstitutional viewpoint discrimination by using its website, e-mail, and other forms of communication to urge opposition to a bill proposing tax credits for private and home schooling.  *Id.* at 277.  In concluding that the government speech doctrine applied, the Fourth Circuit cited *Kidwell* and observed that grassroots lobbying directed at a bill before the state legislature presented "no greater concerns from a democratic accountability standpoint than advocacy regarding measures on the ballot." *Page*, 531 F.3d at 287.

### d. Democratic Accountability and Political Safeguards

As the Supreme Court has observed, "[w]hen the government speaks . . . it is, in the end, accountable to the electorate and the political process for its advocacy." *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 235 (2000). "If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Id.*; *see also Sutliffe v. Epping School District*, 584 F.3d 314, 332 n.9 (1st Cir. 2009) ("If the voters do not like those in governance or their government speech, they may vote them out of office").

*Johanns* suggests that political accountability is not only a justification for the government speech doctrine, but a factor courts should measure in determining whether to apply the doctrine in a particular case. *See Johanns*, 544 U.S. at 563-64. The Supreme Court concluded in *Johanns* that the beef advertisements were "subject to political safeguards more than adequate to set them apart from private messages." *Id.* at 563. The Court noted that the program was governed by federal laws and regulations, that "[t]he Secretary of Agriculture, a politically accountable official, oversees the program, appoints and dismisses the key personnel, and retains absolute veto power over the advertisements' content, right down to the wording," and that "Congress, of course, retains oversight authority, not to mention the ability to reform the program at any time." *Id.* at 563-64.

## D.    Application of the Government Speech Doctrine to This Case

Although the Plaintiffs are vague about the precise constitutional claims they are making, they have sued only MMA—not any of its municipal members or any of the PACs in which it participated—and have asked in their First Amended Complaint for relief from MMA's "monetary contributions to and staff participation in political action committees dedicated either to opposing or supporting Direct Citizen Initiatives." *First Am. Compl.* (introductory paragraph). In Count I, the Plaintiffs allege that "MMA contributions to and participation in PACs supporting or opposing Direct Initiatives" violate their First and Fourteenth Amendment rights. *Id.* ¶ 15. Count II asks for declaratory judgment; Count III adds an alleged violation of the individual Plaintiffs' free speech rights; Counts IV-VI assert state

law claims.  Thus, in determining whether the government speech doctrine applies, the Court focuses only on MMA's monetary contributions and staff participation in the various PACs.  The Court need not consider whether the PACs' speech is protected by the government speech doctrine, since the First Amended Complaint does not allege that the PACs' speech has worked any cognizable legal injury to the Plaintiffs.  Moreover, since it is undisputed that none of the Plaintiffs was coerced or compelled into contributing to MMA, a voluntary membership association, any compelled subsidy theory argued by the Plaintiffs must fail.[55]

The Court concludes that the government speech doctrine applies to prevent the Plaintiffs' Free Speech Clause claims from going forward against MMA because MMA's speech was effectively controlled by the government.  As its name implies, MMA is an association of municipalities in Maine.  From 2002 to 2009, the period involved in this case, nearly 100% of Maine municipalities were municipal members of MMA.  Although MMA allows private citizens to join as "patrons," its internal governance structure gives municipal officials exclusive control over organizational decisions.    MMA's  Executive  Committee,  which  controls  and  manages  the

---

[55]      Indeed, given the attenuated connection between the individual Plaintiffs' payment of municipal taxes and MMA's advocacy activities, they may lack standing to the extent they rely on municipal taxpayer standing.  However, the Court has not analyzed standing for several reasons.  First, whether the individual Plaintiffs have standing is to some degree intertwined with whether they have stated a cognizable claim under the First Amendment.  *See Griswold*, 616 F.3d at 56 (finding it "prudent to dispose of both standing and merits issues together" because they are "difficult to disentangle"); *Newton v. LePage*, 789 F. Supp. 2d 172, 179 (D. Me. 2011) (concluding that under *Griswold*, it made "good sense to follow the First Circuit's lead and treat standing and the merits as intertwined").  Second, the motion before the Court focuses only on the government speech doctrine and the parties have not fully briefed standing, although the Court acknowledges that the parties discussed standing in their briefs on the cross-motions for summary judgment that the Court dismissed without prejudice.  Third, even if municipal taxpayer standing did not support the individual Plaintiffs' Free Speech Clause claims, they may nonetheless have standing to bring their other claims—though if they lack standing as to all of their federal claims, this Court would lack jurisdiction over their state law claims.

Association and holds and manages all MMA property, is comprised exclusively of municipal members. Similarly, its Legislative Policy Committee, which determines its positions on legislation and citizen initiatives, is comprised exclusively of municipal members. The EC and the LPC controlled MMA's positions on each of the tax referenda at issue in this case, and the EC authorized the expenditure of substantial funds to support MMA's positions.

Taken together, these facts present a stronger case for the application of the government speech doctrine to MMA than the facts in *Johanns*, where a committee made up of private industry representatives designed the advertisements at issue.[56] Here there was no private involvement; MMA's decisions to fund and participate in PACs were decisions within the exclusive and complete control of municipal officials.

---

[56]      While the Court's conclusion that the government speech doctrine applies is driven primarily by the control municipal officials exercised over MMA's advocacy activities, additional facts show that MMA is more like a governmental than non-governmental entity. For instance, MMA is subject to some portions of Maine's Freedom of Access Act. According to the parties' stipulation, the relevant statutory provisions were, as of 2008, 1 M.R.S. §§ 402(3) and 408. *See Stip.* ¶ 10 (citing PSMF ¶ 19). The Court accepted the parties' stipulation, even though these provisions do not explicitly refer to MMA. The Maine Legislature subsequently repealed 1 M.R.S. § 408 and replaced it with 1 M.R.S. § 408-A, but the applicable substantive provisions do not appear to differ. *See* An Act to Amend the Laws Governing Freedom of Access Mandate, 2011 Me. Laws 662, §§ 4, 5 (repealing 1 M.R.S. § 408 and enacting 1 M.R.S. § 408-A).

In addition, since 2009, MMA employees have been eligible to participate in the Maine Public Employees Retirement System and MMA is a "participating local district" within the meaning of 5 M.R.S. § 17001(27), which defines those entities that have approved the participation of their employees in the state retirement system.

These facts do not relate directly to governmental control of the speech in this case and thus are marginally, if at all, material under *Johanns. See Johanns*, 544 U.S. at 560 (finding that "[t]he message of the promotional campaigns is effectively controlled by the Federal Government"). In other words, if the speech at issue had been controlled by private actors, the fact that MMA's employees were enrolled in a government retirement program would not convert that speech into "government speech." At the same time, the degree to which MMA is intertwined with state and local government reinforces the Court's conclusion that the speech at issue in this case is government speech.

The Plaintiffs contend that MMA cannot be considered the "instrumentality or agent" of its members because not every one of MMA's nearly five hundred municipal members agreed with every one of MMA's policy positions. "Instrumentality" and "agent" are not terms of art with any significance under the government speech doctrine, and even if they were, this argument lacks merit. MMA is a voluntary membership association made up of nearly five hundred members.  One of its legitimate goals, as the Plaintiffs concede, is to advocate on behalf of its members.  In any large membership association it is inevitable that not every member will agree with every association position.  If MMA were to require unanimity in all of its affairs, it could not function.  Each member is, however, entitled to influence the association's policies through internal governance structures, and each member implicitly consents to be represented by the association simply by joining it.  MMA is unlike the California State Bar in *Keller* and the public teachers' union in *Abood* because neither membership in nor funding of MMA is compelled by law or necessity.  Any municipality that wishes to terminate its membership in MMA based on a policy disagreement or for any other reason is free to do so.[57]

 Although this case at first blush presents an even stronger case for the government speech doctrine than *Johanns*, the Court must decide whether the type of speech involved here warrants an exception to the doctrine, as the Plaintiffs urge.

---

[57]    And though nearly all of Maine's municipalities were members of MMA at the time this suit commenced, the possibility of influencing MMA's policies by withdrawing is not merely theoretical: a number of Maine municipalities withdrew from MMA in the 1970s over MMA's position on a uniform property tax.

The Court follows the Fourth and Sixth Circuits in declining to craft a bright line political or campaign speech exception to the government speech doctrine. The Court rejects the Plaintiffs' invitation to follow Judge Martin's dissent rather than the well-reasoned and legally sound majority opinion in *Kidwell*. The Sixth Circuit noted in *Kidwell* that the government speech at issue in that case "fit[ ] squarely within [the city's] competence as governor" and did not support a particular candidate. *Kidwell*, 462 F.3d at 625-26. Here, too, it is undisputed that MMA's advocacy activities related to initiatives that it perceived would have serious consequences for municipal governments, and that the activities at issue did not support a particular candidate. Whether the outcome would be different if either or both of these factors were absent, the Court need not decide.

The Plaintiffs attempt to distinguish *Kidwell* by arguing that the campaign issues in *Kidwell* were local, whereas here they were statewide, and by arguing that the amount of money expended in *Kidwell* was "de minimis," whereas here the amount was substantial. These distinctions do not have Constitutional significance. As Judge Matsch has observed, "[f]undamental principles of constitutional law must not depend upon subjective judgments about the relative power of participants in public debate to influence the electorate." *Colorado Taxpayers Union, Inc. v. Romer*, 750 F. Supp. 1041, 1045 (D. Colo. 1990); *see also Citizens United v. Federal Election Commission*, 558 U.S. 310, 130 S. Ct. 876, 904 (2010) ("The First Amendment's protections do not depend on the speaker's 'financial ability to engage in public discussion.'") (quoting *Buckley v. Valeo*, 424 U.S. 1, 49  (1976)).

*Kidwell* might also be distinguished as involving the speech of a city and a city manager, whereas this case involves what the Plaintiffs contend is a non-governmental entity. From the Court's perspective, this distinction weakens rather than strengthens the Plaintiffs' case since it precludes the Plaintiffs from bringing a compelled subsidy claim against MMA (and perhaps even deprives them of standing, *see* note 55). Moreover, the labels governmental and non-governmental are not the key to the government speech doctrine under *Johanns*. The government speech doctrine applies because MMA's municipal members—unquestionably government entities—effectively controlled its advocacy activities through its internal governance structures such as the Executive Committee and Legislative Policy Committee.

### E. The Effect of the Court's Ruling that the Government Speech Doctrine Applies

The Court holds that the government speech doctrine applies to MMA's advocacy activities. This is another way of saying that MMA has not violated the Plaintiffs' rights under the Free Speech Clause of the First Amendment of the United States Constitution, incorporated against the states through the Fourteenth Amendment.[58] Accordingly, the Court grants summary judgment for MMA on Count III. Count I alleges that MMA's activities constitute "government taking sides" and "direct governmental interference with an initiative." To the extent this claim sounds under the Free Speech Clause of the First Amendment, the Court also grants summary judgment to MMA on Count I. The Court similarly grants

---

[58]   Although the government speech doctrine might not apply to some compelled speech cases, *see Johanns*, 544 U.S. at 564-66, the Plaintiffs have not made a compelled speech argument.

summary judgment on Count II (seeking declaratory judgment) to the extent it references Free Speech Clause claims asserted in Counts I and III.

As it appears that the Court's decision disposes of all of the Plaintiffs' federal claims, the Court would decline pendent jurisdiction over the state law claims (Counts IV, V, and VI) and would remand the case to the Kennebec County Superior Court.  However, out of an abundance of caution, the Court gives the Plaintiffs fourteen days from the date of this Order to inform the Court of their position as to whether any of their federal claims retain vitality.  If the Plaintiffs contend that their federal claims remain viable, the Court will set a schedule for the parties to brief the remaining issues.

### F.    The Narrowness of the Court's Ruling

The Court's conclusion that the government speech doctrine applies does not mean that the Plaintiffs have no good claims against MMA, nor does it mean that the Court endorses or does not endorse MMA's advocacy activities as a matter of policy.  The Court holds only that the Free Speech Clause of the First Amendment of the United States Constitution does not reach the conduct the Plaintiffs complain of.  As the First Circuit has noted, "there are certainly other restraints on the government in a case such as this.  If the voters do not like those in governance or their government speech, they may vote them out of office, or limit the conduct of those officials by law, regulation, or practice." *Sutliffe*, 584 F.3d at 332 n.9 (internal citations and punctuation omitted).

As a matter of policy, there is something intuitively odd about the government taxing tax protesters and others to defeat citizen efforts to control

taxes.   There is also a certain Orwellian aspect to the vision of government-sponsored speech drowning out the voices of ordinary citizens and in so doing assuring the continued sustenance and primacy of government itself.  *See* GEORGE ORWELL, NINETEEN EIGHTY-FOUR (1949).  But here the Plaintiffs have not made the case, if it could be made, that government speech so dominated the debate that the views of others, including the Plaintiffs, were eclipsed.

More to the point, MMA is a creature of state law, and its municipal members are political subdivisions of the state of Maine.  The citizen initiatives that led to the dispute in this case are governed by the Maine Constitution; indeed, there is no federal equivalent.  Unless a federal right is threatened, it is generally not the business of the federal courts to intervene in a state's political disagreements.  Particularly where a dispute involves a political process specific to a state—such as the citizen initiatives at issue here—that state's judiciary is better positioned than the federal courts to resolve the dispute, and in so doing to articulate the rights of the citizens of that state.

In addition to litigating this case in state court, the Plaintiffs have an abundance of other avenues to pursue the relief they seek.  Many are political.  At the local level, they may run their own slate of candidates, who—if elected—would then be empowered to change municipal policy.  Alternatively, they may petition their municipalities to take a different stance—whether by asserting themselves within MMA's internal governance structures or by withdrawing from MMA.  At the state level, they may petition the Maine Legislature to pass a law or to propose a

constitutional amendment limiting MMA's ability to fund and participate in PACs (assuming Maine law does not already limit MMA's PAC-related activities).  *See* Alyssa Graham, *The Government Speech Doctrine and Its Effect on the Democratic Process*, 44 SUFFOLK U. L. REV. 703, 713-16 (2011) (discussing laws in Arizona, Colorado, and Massachusetts that limit the use of public funds to influence the outcomes of elections).  In the state of Maine, they may attempt to enact such a law through the citizen initiative process.

A core principle of our system of government is that more speech is better than less, and the Plaintiffs remain free to make their own voices louder and more persuasive in the marketplace of ideas.  As the First Circuit recently wrote in *Newton v. LePage*, 700 F.3d 595 (1st Cir. 2012), "governors and administrations are ultimately accountable to the electorate through the political process, which is the mechanism to test disagreements," *id.* at 604, and here, the marketplace to challenge the policies of any municipality is purely local.

## IV. CONCLUSION

The Court GRANTS MMA's Motion for Summary Judgment (ECF No. 58) in part in that it concludes that the government speech doctrine applies and DISMISSES Counts I, II, and III of the First Amended Complaint (ECF No. 15) insofar as those Counts assert claims under the Free Speech Clause of the United States Constitution; the Court DISMISSES without prejudice in part MMA's Motion for Summary Judgment as to Count IV of the First Amended Complaint, which asserts claims under the Constitution of the State of Maine.  The Court

ORDERS the Plaintiffs to notify the Court within fourteen days of the date of this Order of their position as to the effect of this ruling on their claims in Counts I and II of their First Amended Complaint.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 14th day of February, 2013